[Crim. No. 42015. Second Dist., Div. Two. June 6, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
KARL WEBSTER, Defendant and Appellant.

680

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Ernest Martinez, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Norman H. Sokolow and Otis D. Wright, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ROTH, P. J.—Describing crimes resulting from three separate incidents, an information charged appellant with the murder and armed robbery of Larry Haines (incident 1; counts I and II), assault with a deadly weapon and attempted armed robbery upon Jesus Castillo, robbery of Francisco Castillo, assault with a deadly weapon upon Luz Figueroa (incident 2; counts III-VI), attempted robbery and assault with a deadly weapon upon Russell Harris, and assault with a deadly weapon upon Leanna Harris (incident 3; counts VII-IX).

Each count also alleged personal use of a firearm within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1). Counts II, III, IV, VII and VIII further alleged personal injury to the victim within the meaning of Penal Code section 12022.7.

A jury found appellant not guilty of counts I and II[1] but guilty as to counts III-IX, with the special allegations pertaining to the latter counts being found true.

Criminal proceedings were adjourned and appellant was delivered to the California Youth Authority (CYA) for diagnostic study pursuant to section 707.2 of the Welfare and Institutions Code. Thereafter probation was denied and he was sentenced to serve eight years in the state prison.

On the appeal it is first contended the evidence was insufficient to sustain the convictions on counts VII, VIII and IX, those involving Russell and Leanna Harris and which arose out of what we have designated as incident 3. At the same time, it is accepted by both appellant and respondent that in the resolution of this claim an appellate court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value —such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

Guided by this principle, the further facts respecting both incident 2 and incident 3 inherent in the basis for our rejection of the contention are these.

On October 20, 1980, at approximately 9:15 p.m. Jesus Castillo, Francisco Castillo, Luz Figueroa and Patricia Figueroa Castillo drove to the Champion Liquor Store at 66th and Figueroa Street in the City of Los Angeles. They parked the car in the parking lot next to the store, went in, purchased sodas and chips and returned to the vehicle. As they approached it they passed two young black males about eighteen years of age. One was wearing khaki pants, a sweatshirt and a black cap with an emblem depicting two golf clubs on it.

Luz Figueroa got into the back seat of the car from the driver's side. At that point, while Jesus was standing by the driver's door, the man with the black cap

---

[1] Incident 1 actually occurred October 21, 1980, at the 68th Street School where Larry Haines was a night custodian working a 1 a.m. to 9:30 a.m. shift. The school is located about three blocks from the Champion Liquor Store and approximately five blocks from the Alladin Liquor Store. Haines, who was shot sometime during his shift with the same weapon used in incidents 2 and 3 and who had apparently been robbed, was discovered wounded at the school by his wife and died after being transported to a hospital. As appellant was acquitted on this charge we omit any further discussion thereof.

grabbed him from behind and knocked him to the ground—towards the rear of the car. As Jesus was getting up, the assailant shot him once in the chest.

The assailant then went around the back of the car to the passenger side, where Francisco and Patricia were standing and pointed the gun at them. Although Francisco did not speak or understand English, he believed that the assailant was asking him for something because the assailant extended his right hand out with his palm faced upward and curved his fingers back and forth while talking to him in English. As a result, Francisco took out his wallet and threw it on the hood of the car. The assailant took the wallet and fled.

Before he left, however, he went by the front of the car and fired one shot at Luz Figueroa, who was inside the car sounding the horn for help. The shot went through the windshield and grazed her right arm. The assailant and his companion then ran south along Figueroa Street.

About two and a half hours later, at approximately 11:45 p.m., Russell Harris and his wife Leanna drove to the Aladdin Liquor Store at Hoover and Florence, some five blocks from the Champion Liquor Store. Leanna dropped Russell off in front of the store, made a U-turn and parked on the other side of the street.

After making his purchase, Russell Harris crossed the street to where his car was waiting. Upon opening the passenger door, he was approached from behind by a man armed with a handgun who ordered him into the car and told him to slide over. Russell, attempting to push his assailant back with his foot, was instead shot by him in the stomach.

Leanna Harris thereupon grabbed the keys from the car's ignition and ran screaming across the street toward the liquor store. Four or five shots were fired apparently in her direction, shattering the store's windows. The flight and shooting were witnessed by Mark Baines who had just emerged from the liquor store.

At the trial, Francisco Castillo, Luz Figueroa and Patricia Figueroa Castillo positively identified appellant as the gunman in incident 2, reiterating their pretrial police photo identifications, and it is not urged here appellant was anything but properly convicted of the charges associated with that incident.

Similar compelling evidence, however, was not present respecting who was the culprit in connection with incident 3 involving Mr. and Mrs. Harris. Neither of these victims sufficiently observed their assailant to be able to identify appellant as that person and Mark Baines, who had earlier selected appellant's police photo as one which "looked like the man [assailant] he saw," could not repeat his identification at trial.

As a result, appellant urges, the above quoted principle announced in *People* v. *Johnson* cannot be satisfied because " 'An extrajudicial identification that cannot be confirmed by an identification at the trial is insufficient to sustain a conviction in the absence of other evidence tending to connect the defendant with the crime.' " (*People* v. *Gould* (1960) 54 Cal.2d 621, 631 [7 Cal.Rptr. 273, 354 P.2d 865]. See also *In re Miguel L.* (1982) 32 Cal.3d 100 [185 Cal.Rptr. 120, 649 P.2d 703]; *In re Johnny G.* (1979) 25 Cal.3d 543 [159 Cal.Rptr. 180, 601 P.2d 196]), the claim being such evidence was lacking here. ■ We disagree. What was also established at the trial was that the gunshot wounds inflicted on Jesus Castillo and Russell Harris derived from the same weapon. This essential fact, coupled with those concerning the time-space proximity between incident 2 and incident 3 and the testimony of Mrs. Harris that based on his voice the assailant was a young black male, while not conclusive, sufficed, in our view, to provide the basis for a prudent trier of fact to find present the essential elements of the particular crimes involved, beyond a reasonable doubt. (See *Jackson* v. *Virginia, supra,* 443 U.S. 307, 319 [61 L.Ed.2d 560, 573]; cf. *In re Eugene M.* (1976) 55 Cal.3d 650, 657 [127 Cal.Rptr. 851]; *In re Anthony T.* (1980) 112 Cal.App.3d 92, 101-102 [169 Cal.Rptr. 120].)

■ It is also contended that the trial court erred in soliciting and relying upon ex parte telephone communications with CYA officials in sentencing appellant to state prison.

On this point the record discloses that at the time set for sentencing the trial court remarked:

"The record should show there is a diagnostic study and evaluation from the California Youth Authority prepared on or about January the 14th, 1982.

"The Court has read and considered that report and its recommendation.

"Have you had a chance to read it, Mr. Simpson? [Counsel for appellant.]

"MR. SIMPSON: Yes, I have, Your Honor.

"THE COURT: I will be glad to hear anything you have to say, Mr. Simpson, although I can tell you quite frankly I do not intend to follow it, but I will be glad to hear from you.

". . . . . . . . . . . . . . . . . . . . .

"I'm concerned only with the cold facts of this case and this youngster, this young adult, who by the fortuitous events of his birth, escapes a 23-year sentence because that is what the sentence would be for an adult.

"That is what the maximum permissible sentence is in this case, and just because he was two months shy of having reached 18 when these crimes were committed, that he finds himself committed to the Youth Authority, and I think you ought to know and I want the record to show that I personally called the California Youth Authority to find out what sort of a sentence this would carry if he were committed to the Youth Authority.

"And I'm shocked to be told that he would be there something less than two years in all probability for a grade class 2 crime such as where there is no death involved, he will probably be there somewhere around 18 months, and I think that that period of time is relatively to me absolutely shattering to think that anybody who shoots somebody, two different individuals and is guilty of eight separate and distinct—eight separate and distinct crimes in which two people are very severely injured as the result of gunshot wounds, will be committed to the Youth Authority and they would keep him there for a period of 18 months, there is something wrong with the system.

"And I think if that is the way they are going to operate, I think the criticism that they get is well-deserved.

". . . . . . . . . . . . . . . . . . . . .

"I think anybody who did what this defendant did is to be punished for it, and I don't think a commitment to Youth Authority will do anything for him at all.

"He is not the kind of person, in my opinion, who belongs in the Youth Authority and I did talk to the counselors.

"I talked to the people who joined in this recommendation and not one of them can justify this kind of a finding. Not one of them can justify the recommendation that they made, which is something that just disillusions me completely about the whole Youth Authority process."

Eschewing any claim the rationale thus employed by the trial court was otherwise objectionable, appellant urges the receipt of information in the fashion indicated was improper to the extent of constituting reversible error, and in support of the proposition relies upon the reasoning found in *In re Calhoun* (1976) 17 Cal.3d 75 [130 Cal.Rptr. 139, 549 P.2d 1235]. There, in a context of whether multiple offense convictions should receive concurrent or consecutive sentences, the prosecution provided the trial court with its ex parte letter recommendation of the latter mode of punishment, a suggestion which for whatever reason was thereafter in fact reflected in the sentencing order. In concluding such a communication could not serve as the basis for the determination arrived

at, both in view of the requirements of Penal Code section 1204[2] and in terms of constitutional considerations, our Supreme Court observed that:

"We are compelled to require exclusion of such ex parte communication not only by section 1204, but also by our responsibility to construe section 669 to avoid possible constitutional infirmity. Although the full adversary safeguards of trial need not apply in the sentencing procedure (*Williams* v. *New York* (1949) 337 U.S. 241 . . .), both state and federal decisions have recognized the defendant's right to be present with counsel at sentencing (*In re Levi* (1952) 39 Cal.2d 41 . . . ; *Mempha* v. *Rhay* (1967) 389 U.S. 128 . . .), and to compel disclosure of statements used against him in probation and parole proceedings (*People* v. *Vickers* (1972) 8 Cal.3d 451 . . .; *Morrissey* v. *Brewer* (1972) 408 U.S. 471 . . .).

"Such decisions cast doubt on the constitutionality of the trial court's receipt of sentencing information adverse to the defendant without affording him an opportunity to respond. Such a procedure undermines the rationale of extending the defendant's protections: to guard against the inadvertent use of misinformation and to ensure the defendant an adequate opportunity to present his claims (*In re Perez* (1966) 65 Cal.2d 224, 229-230 . . .). If a judge may receive information outside the record, there seems little point in ensuring a properly adversary procedure at sentencing." (*Id.,* 17 Cal.3d at p. 84.)

Having so decided, the court in *Calhoun,* in effect, set aside the sentencing order. We think a like result must follow here.

For its part, respondent "does not argue with the fact that appellant is entitled to the opportunity to respond to adverse sentencing information (*In re Calhoun, supra,* 17 Cal.3d at 84, . . .," but maintains that the "information [received] was a neutral statement of fact: that [appellant's] probable length of confinement at CYA would be 18 months" so that remand on the point "will not alter the fact as to what is the usual period of commitment [to CYA] for this grade offense, nor will it likely alter the [trial] court's feelings that such is an insufficient period of confinement for this individual."[3]

---

[2]The statute provides in part that: "No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and preceding sections."

[3]It is also urged, perhaps inconsistently, that the language of Penal Code section 1204 (see fn. 2) speaks only in terms of "aggravation or mitigation of the punishment" and that what is involved in the present case is instead a "sentence choice," such that the statute is without application. Quite apart from the fact that the decision in *Calhoun,* which also did not relate to aggravation or mitigation as those terms are defined in California Rules of Court, rule 405(d) and (e), is at odds with the assertion, its rationale was as we have noted premised not only upon the statute, but also upon the requirements of due process.

The argument, however, misses the point at the very least in assuming the information conveyed was from a definitely ascertainable source and was in truth a statement of fact, and that even if it were, that appellant, given the chance to explore it, would in any case not have been able to cast it in a light favorable to him. Accordingly, we are persuaded the trial court's sentencing decision cannot stand. Our conclusion in this regard should not be interpreted as suggesting a belief on our part that the present determination was harsh or was erroneous, per se. In fact, if the policies and practices of the CYA are truly those described by the trial court, we share its expressed concern. We hold only that a hearing to determine such questions must be conducted in accordance with prescribed evidentiary rules.

The judgment of conviction herein is affirmed. The matter, however, is remanded for a new sentencing hearing consistent with this opinion.

Beach, J., and Gates, J., concurred.