Filed 10/29/20  In re R.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| In re R.B., a Person Coming Under the Juvenile Court Law. | C091244 |
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>R.B.,<br><br>       Defendant and Appellant. | (Super. Ct. No. PDL20170035) |

Minor R.B. shot and killed his stepfather.  After finding the minor a ward of the court, the juvenile court held a lengthy dispositional hearing to decide whether to commit him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ), or instead to El Dorado County's Juvenile Treatment Center (JTC) in South Lake Tahoe.  Over multiple days, the court heard testimony from juvenile justice experts and an expert in adolescent and forensic psychiatry, and received a probation report that

1

recommended JTC placement. The court also visited a DJJ facility and spoke with staff there about the minor's case and his potential sentence; the court was not accompanied by the parties or their representatives on this visit. Ultimately, the court committed the minor to a maximum term of 50 years at DJJ.

On appeal, the minor contends the juvenile court abused its discretion in sentencing the minor to DJJ because substantial evidence supports a commitment to the JTC. He also contends the court improperly relied on ex parte evidence by touring the facility and speaking with the staff about the minor's case out of the presence of the parties. Because we conclude the court received and considered prejudicial ex parte evidence, we reverse.

BACKGROUND

"[The minor] armed himself with a firearm and shot his stepfather in the back of the head and that resulted in his death." The minor admitted the allegations in the dependency petition (Welf. & Inst., § 602) that he committed murder (Pen. Code, § 187, subd. (a)),[1] with special allegations that he personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). The juvenile court sustained the petition and adjudged the minor a ward of the court. The minor was placed at JTC pending disposition.

The court then held a disposition hearing that spanned several months and included multiple witnesses. Daniel Macallair, the executive director of the Center on Juvenile Criminal Justice, a non-profit that analyzes policies and provides technical assistance in the field of juvenile and adult justice, was designated an expert of the DJJ

---

[1] Undesignated statutory references are to the Penal Code.

system.[2]  He provided an overview of the system and testified that there is a high rate of violence because, by one estimate, 80 percent of the juveniles at DJJ have a gang affiliation.  He also said it would be particularly difficult for a resident from a rural county, such as the minor, to assimilate at DJJ because he was not "steeped in gang culture" and would be "very vulnerable."

Kristina Davies, a mental health program coordinator at the JTC, testified regarding the mental health programs and overall treatment at the JTC.  She had read a psychological evaluation of the minor and said he was engaged in the programming and moving through it appropriately since he arrived.  Davies also testified the longest current commitment at the facility is 240 days and the current interventions available are for moderate level offenses, so the JTC would need to revise its programming to keep the minor long term.

Dr. Matthew Soulier, an expert in adolescent and forensic psychiatry, had interviewed the minor and testified to the respective appropriateness of the JTC and the DJJ for minor's placement; he also filed a report.  He was concerned for the minor's development if placed in the violent environment of the DJJ, which is more prison-like as compared to the JTC, which is a more nurturing environment conducive to learning.  The seriousness of the minor's crime made him an "odd fish"--he committed a serious crime but there is no contention he is antisocial.  Dr. Soulier described the dilemma as trying to "thread a needle that, perhaps, is unthreadable.  Frankly, I don't think we have an ideal option for [the minor].  That's my overall opinion.  I think that he could benefit from [the] DJJ."  Dr. Soulier also recognized the JTC was not adapted to support the minor and would have to develop different counseling options than what they currently have in order to help the minor.  To do this, "the JTC would have to be highly invested and really

---

[2]  The DJJ was formerly known as the California Youth Authority and is sometimes referred to as the Department of Juvenile Facilities.  We refer to it as the DJJ throughout.

3

want to be innovative and to create something on [the minor's] behalf" because they did not have "adequate services at this exact moment."

Officer Jennifer Schindler, a senior deputy probation officer with El Dorado County, testified the minor was doing very well and had an honor sheet, which is their highest status, and generally has been successful at the JTC with a good attitude. But she also testified he had almost completed all the programming currently available at the JTC and he had some behavioral issues in the past resulting in the loss of his honor sheet status.

The court also considered the testimony of Agent Josie Montano, a DJJ parole agent who testified at an earlier transfer hearing about general DJJ background and intake. She testified the baseline discharge at the DJJ for murder is seven years, "it's not a guarantee, but it would be the first time that they would be eligible for discharge" before reaching age 25 and automatic release.

The probation officer filed several reports for disposition. The initial report recommended a 90-day diagnostic with the DJJ to determine the minor's fit with a DJJ facility. The report also included a letter from JTC staff concluding their programming might not be suitable for the minor, given the length of programming needed. The court asked the probation officer to file another report recommending either the JTC or the DJJ, without the 90-day diagnostic. The final probation recommendation was for the minor to remain at the JTC for an additional 496 days to graduate from his current programming and then permit him to advance to family therapy. This was based on his current success at the JTC and the potential victimization and negative influences at the DJJ. At the hearing, the probation officer testified the "recommendation is supported by an entire probation department, to include my supervisor with significant experience in juvenile court and the only other officer I know of who has been assigned a juvenile murder case in El Dorado County. [¶] This recommendation also comes with the support of the

4

department's [JTC] and program coordinator who will be responsible for the continued treatment of [the minor]."

During the hearing, the court indicated it was "considering" touring a DJJ facility. Minor's counsel immediately responded "[t]hat'd be great" but also indicated several times that she wanted to accompany the court, but was concerned she would not be allowed in. The court responded: "I don't know if they'll let all four of us in, but I'll ask to do it that way. And if they don't want all of you to come, then I'll go myself, but I'll try and make sure that all three of you can come with me." The conversation continued about other aspects of placement, and minor's counsel did not voice any objection to anything the court had said.

At the next hearing date, about a month later, the juvenile court explained it had toured a facility by itself and, "[m]y impression was it's not as bad as I thought it was going to be" and that "I don't think it's as much of a black hole as it used to be." The court described the many programs and the revised rehabilitative approach in the time since the court's experience there, including an individualized assessment of how dangerous a youth is to determine the proper housing within the facility. Though the facility staff conceded there was still violence, it has decreased and now the most violent youth are segregated from the rest of the population.

The juvenile court told the parties that it also had asked facility staff whether a youth with a murder conviction "would automatically be with [the] high-risk population." The court was told "they house by risk level, so they said no. They said that, yes, a 187 is going to weigh heavily, but that there are other factors, like education, like having -- being able to recognize what you did wrong." The court continued that it "was concerned [because] of the 187 that if I were to send him there, that he might be in the highest risk housing units, but they use the [Youth Assessment and Screening Instrument] to figure out what the risk is." The superintendent of the facility also told the court "just because [the minor] has a 187, it doesn't mean that he has to be there for seven years. If he

5

completes the programming and he's doing really well, there's some time period. . . ." "[I]f he does well, . . . then he can . . . ask to be paroled."

The minor's counsel noted that this new information regarding parole conflicted with Agent Montano's testimony and, "I'm at a disadvantage at this point, because how do I cross-examine the information that you received yesterday?" The court said the minor's counsel had given the court permission to go and counsel disagreed, saying: "I objected to it, and I asked you if you were going to do it, I wanted to go as a group so that we didn't have this problem." "I did not specifically say that I was concerned that you were doing your own investigation. I did very much say I wanted to go with you if you were going to go." The court responded it "understood that, and I tried to get all three of you to go with me, but I didn't -- I didn't set it up. [¶] So I'll look at the last transcript, and if you objected that I shouldn't have gone, then I will disregard everything I saw." There was no further discussion on this issue at this or any subsequent hearing.

Before making its decision at the final hearing date, the juvenile court provided an overview of the applicable law and evidence considered, mentioning it "toured" the DJJ facility. Ultimately, the court did not think the JTC provided the minor with sufficient programming to address his rehabilitative needs. Instead, the DJJ programming is "significantly more comprehensive," especially for "a person who's committed murder and especially with the amount of trauma that [the minor] has." The court consequently committed the minor to the DJJ for a maximum period of confinement of 50 years to life. The minor timely appealed.

DISCUSSION

The minor first argues the juvenile court abused its discretion in committing him to the DJJ because there was substantial evidence such placement would not benefit him and the JTC was a less restrictive alternative. The minor also asserts the court improperly engaged in independent fact gathering and relied on its personal experience of visiting the DJJ in making the disposition. The People argue there was substantial evidence

6

supporting the decision and the minor forfeited any objection to the tour because the minor had several opportunities to object and did not. The People also argue that the court's personal observations were essentially hearsay, which is permissible in a juvenile hearing because minors do not have a right of confrontation at disposition, even if they have such a right at a jurisdictional hearing.

We need not address the minor's sufficiency of the evidence challenge because we conclude the court's consideration of ex parte evidence was prejudicial error.

The scope of permissible evidence to be considered at a disposition hearing is broad and includes "the social study of the minor made by the probation officer and any other relevant and material evidence that may be offered." (Welf. & Inst. Code, § 706.) This statute expressly authorizes the juvenile court to receive and consider otherwise inadmissible evidence at the disposition hearing, including hearsay, so long as it is relevant and material to the disposition issue. (*In re Michael V.* (1986) 178 Cal.App.3d 159, 170, fn. 18; *In re Vincent G.* (2008) 162 Cal.App.4th 238, 244.) But, like in criminal sentencing hearings, ex parte evidence at a juvenile disposition hearing is not permitted. (§ 1204 [sentencing "circumstances shall be presented by the testimony of witnesses examined in open court"]; *People v. Arbuckle* (1978) 22 Cal.3d 749, 753 ["defendant is entitled to an opportunity to respond to adverse sentencing information"]; *In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1846-1847 [finding criminal sentencing cases that apply § 1204 applicable to juvenile disposition hearings].)

The minor forfeited any objection to the court *touring* DJJ alone because he failed to object after the court indicated it would see if all parties could attend, but "if they don't want all of you to come, then I'll go myself." (Evid. Code, § 353 [judgment cannot be reversed "by reason of the erroneous admission of evidence unless: [¶] (a) there appears of record an objection to or motion to exclude or to strike the evidence"]; *People v. Doolin* (2009) 45 Cal.4th 390, 433.) This notified the parties the court might attend the tour alone and the minor's failure to object to the tour forfeited this issue.

However, the *evidence the court received from the DJJ staff about the minor's possible sentence* is distinct from the tour generally. The juvenile court did not announce it would be discussing the minor's case with the DJJ facility staff. This interaction was only disclosed *after* the tour had happened, and minor's counsel promptly and specifically objected. The court implicitly overruled the objection to the court's consideration of the evidence by considering the evidence. The minor did not forfeit his challenge to the ex parte evidence the court received about the minor's possible sentence from the DJJ staff. (*People v. Hall* (2010) 187 Cal.App.4th 282, 292 ["Once an objection has been fully considered and overruled, it is not necessary to repetitiously renew the objection in the same trial to preserve the issue on appeal"].)

The specific information pertaining to the minor's case--that he would not necessarily be placed in the most violent housing and could be paroled in under seven years--was improper ex parte evidence. *People v. Webster* (1983) 143 Cal.App.3d 679 is particularly instructive on this point. There, the trial court was deciding whether to send a criminal defendant, who had committed the crime when he was a few months from his 18th birthday, to state prison or a DJJ facility. (*Id*. at pp. 683-684.) The court stated during the sentencing hearing: "I want the record to show that I personally called the [DJJ] to find out what sort of a sentence this would carry if he were committed to the [DJJ]." (*Id*. at p. 684.) The court was "shocked" how short of a sentence the defendant would likely receive so instead sentenced him to state prison. (*Id*. at pp. 681, 684.)

The appellate court remanded for a new sentencing hearing finding the ex parte evidence improper. (*People v. Webster, supra*, 143 Cal.App.3d at p. 686.) The appellate court found that even if this sentencing information were a neutral statement of fact, the defendant was entitled to try to "cast it in a light favorable to him." (*Ibid*.) Without analyzing the propriety of the given sentence itself, the court "determine[d] such questions must be conducted in accordance with prescribed evidentiary rules." (*Ibid*.)

8

We find this reasoning applicable here, where the minor did not have an opportunity to respond to the information the juvenile court received from the DJJ outside of the courtroom or ask further questions of the source of that information. The court asked officials at the DJJ specific questions about the minor, including where he could be housed and when he could be paroled. Like the court's conversation with the DJJ in *Webster*, the minor here had no opportunity to challenge the veracity or accuracy of the statements received by the court and try to cast such information in a favorable light. Further, some of the information conflicted with testimony received by the court.

The People "acknowledge[] the statutory and constitutional limitations on a court's consideration of information at sentencing," such as section 1204's bar on ex parte communication, but instead posit the court's observations "were no different than hearsay" because the court "disclosed the tour on the record." Although we note that the juvenile court's disclosure was proper, as was the "tour" itself given the absence of any objection, that is not the issue here.

The People attempt to distinguish *Webster* through their assertion that the evidence in *Webster* was ex parte, but in this case it was merely hearsay. This argument fails to persuade. Although the statements made by DJJ staff to the court may have *also* been hearsay when presented in court, as they were third party statements made outside of court and considered for the truth of their contents, here the fact finder and ultimate decision maker received information that informed its decision *outside of court and without the parties present*. This is improper ex parte evidence, regardless of any overlapping classification as hearsay. Hearsay, if admissible, is properly presented and vetted in court with all parties present. Ex parte evidence is presented and received away from the parties, as was the disputed evidence in this case.

We see no material difference between the *Webster* court's calling the DJJ about the defendant's possible sentence and the juvenile court here discussing the minor's possible sentence with DJJ staff while on a tour. Both concern evidence relating to a

9

party's possible sentence, given directly to the decision-maker, out of court and without any concurrent ability by the parties to test or challenge the evidence. The consideration of this evidence undermined the adversarial safeguards of the dispositional hearing and was error. (See *In re Calhoun* (1976) 17 Cal.3d 75, 84 ["If a judge may receive information outside the record, there seems little point in ensuring a proper adversary procedure at sentencing"].)

The error was prejudicial under any standard. (Cf. *In re Celine R.* (2003) 31 Cal.4th 45, 60 [applying the less restrictive "reasonable probability" harmless error test described in *People v. Watson* (1956) 46 Cal.2d 818, 836, in assessing whether error in juvenile court proceeding constituted a reversible miscarriage of justice].) This was, as the court stated, "a very difficult decision." There was no consensus among the multiple witnesses who testified over several hearing dates spanning nearly three months. Dr. Soulier was a core witness, on whom the court relied heavily in its determination (8 RT 904, 943) and testified that there was no "ideal option" for the minor because he was an "odd fish" who could benefit from both options. The probation report was also amended several times because the probation officer found this to be a difficult decision, originally wanting a 90-day diagnostic at the DJJ, and later with the announced endorsement of the "entire department" recommending JTC.

A central concern for the juvenile court with committing the minor to the DJJ was, understandably, the level of violence present that could inhibit the minor's rehabilitation. Before it mentioned it was going to tour the facility, the court said it "recognizes that it's gonna be a more violent environment." "I mean, to me that's just a given." This was also Dr. Soulier's concern with the DJJ. Consequently, discerning the level of violence was a main purpose of the court's tour of the facility, where it asked facility staff about the general level of violence and specifically whether someone like the minor would be put with the most violent offenders. The court was originally concerned "because of the 187 that if I were to send him there, that he might be in the highest risk housing units."

10

But the facility staff assuaged this concern by informing the court they do an individual assessment where the conviction is only one factor. The information on when the minor could petition for parole similarly eased some of the court's concerns about the DJJ. The court interpreted the information as an opportunity for the minor to be paroled, stating if he does well "then he can go in front of the Youth Parole Board and ask to be paroled."

This ex parte evidence could have led the juvenile court to conclude, at least in part, that the DJJ is "not as bad as I thought it was going to be" and "I don't think it's as much of a black hole as it used to be," convincing the court to commit the minor to the DJJ. Further, as counsel for the minor noted when she voiced her objection, the information received by the court about the minor's parole possibilities actually conflicted with other evidence considered by the court.

Although the juvenile court *could* have reached the same conclusions and made the same decision without the ex parte information pertaining to the minor's sentence, we cannot say that the error was harmless. Instead, we conclude that due to the closeness of the issue and the indications this evidence may have swayed the court, there is a reasonable probability the court would not have ordered a commitment to the DJJ without considering this ex parte evidence. Because there is a reasonable probability of a result more favorable to the minor absent the court's error, commitment to the JTC, the error was prejudicial.

## DISPOSITION

The order of commitment is reversed and the matter is remanded for a new disposition hearing in conformity with this opinion.

_____/s/_____

Duarte, J.

We concur:

_____/s/_____

Blease, Acting P. J.

_____/s/_____

Mauro, J.

12